Filed 6/9/21  P. v. Inzunza CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARIA MICHELLE INZUNZA et al.,<br><br>    Defendants and Appellants. | B301380<br><br>(Los Angeles County<br>Super. Ct. No. LA084400) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael Jesic, Judge.  Affirmed in part and remanded with directions.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant Maria Michelle Inzunza.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant Rosa Manuela Barrientos.

Xavier Becerra, Attorney General; Lance E. Winters, Chief Assistant Attorney General; Susan Sullivan Pithey, Assistant

Attorney General; William H. Shin, Idan Ivri and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendants and appellants Rosa Manuela Barrientos and Maria Michelle Inzunza of first degree murder (Count 1) and second degree attempted robbery (Count 2). As to both Barrientos and Inzunza, the jury found true the special circumstance allegation under Penal Code section 190.2, subdivision (a)(17).[1] For Barrientos, the jury also found true that she personally used a firearm pursuant to section 12022.53, subdivision (d) on both counts.[2]

The trial court sentenced Barrientos to life without the possibility of parole on the murder count and imposed a consecutive term of 34 years to life on the attempted robbery charge. Inzunza was sentenced to life without the possibility of

_____

[1] All further undesignated section references are to the Penal Code.

[2] Barrientos and Inzunza were both charged with identical crimes – count 1, first degree murder in violation of section 187, subdivision (a), and count 2, attempted second degree robbery in violation of sections 211, 213, subdivision (b). The prosecution also charged that the murder qualified as a special circumstance under section 190.2, subdivision (a)(17).

Barrientos was additionally charged with personally using a firearm under section 12022.53, subdivision (d) on both counts. It was also alleged, Barrientos had previously suffered a strike prior under the California's "Three Strikes" law. The same prior was alleged as a five-year prior under section 667, subdivision (a). Finally, as to both Barrientos and Inzunza, the prosecution alleged that a principal was armed with a firearm under section 12022, subdivision (a)(1) on both counts.

parole for the murder count and a consecutive term of three years determinate for the robbery charge. Both filed a timely notice of appeal.

On appeal Barrientos contends: (1) trial counsel's failure to defend constitutes abandonment under *U.S. v. Cronic* (1984) 466 U.S. 648 (*Cronic*) and requires reversal of both counts, (2) trial court's sentence on count 2 violated section 654, (3) trial court's second strike sentence must be reversed as unauthorized because the prior conviction was never found true, and (4) trial court's imposition of consecutive sentences based on factual findings by the trial court violated her Sixth Amendment right to a jury trial under *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*).[3] Inzunza contends the trial court's imposition of life without the possibility of parole on the murder count violated the Eighth Amendment because the change in law under Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437), as applied, fails to provide a meaningful basis for distinguishing between those persons deserving of special circumstance from those who are not. She additionally raises two other contentions that are identical to those made by Barrientos (contentions 2 and 4). As to Barrientos's contentions, the Attorney General concedes the second strike prior conviction allegation was never found true. On this as to Barrientos, we remand for resentencing on count 2. As to Inzunza's contentions, we agree her sentence on count 2 violated section 654 which, like for Barrientos, requires a remand for resentencing. We otherwise affirm the judgment as to both Barrientos and Inzunza.

---

[3]    The *Apprendi* contention was raised by Inzunza, joined by Barrientos.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Prosecution's Case*

On Saturday, September 24, 2016, Inzunza's friend, Cynthia Aguirre along with her boyfriend, Yanatan Garcia, called Inzunza to hang out. Garcia and Aguirre drove to South Central Los Angeles to pick her up. Aguirre and Inzunza decided to also invite Barrientos to join them. Barrientos and Inzunza were involved in a romantic relationship. After Barrientos was picked up, the four went to Garcia's house to drink alcohol.

Prior to reaching Garcia's home, they went to several liquor stores to buy alcohol. Once alcohol was obtained, they headed for Garcia's home to drink and hang out.

After a few hours of drinking, Aguirre left Garcia's home with Inzunza and Barrientos. The three decided to buy more alcohol. They drove to a liquor store on Sherman Way and Bellaire Street. Aguirre was told not to park in the liquor store parking lot but instead, to park on the street. Aguirre parked on Bellaire Street with the emergency lights on. Barrientos and Inzunza got out and went into the store. As Aguirre waited, Barrientos and Inzunza came running back to the car. Inzunza told Aguirre that Barrientos had gotten into a fight with the store's clerk. Aguirre drove away and eventually dropped the two off at Barrientos's home. Almost immediately, Inzunza called Aguirre to come back. She then took the two to Inzunza's mother's home. The next day, Aguirre heard that "something terrible" occurred at the liquor store and that the police wanted to talk to her.

On September 24, 2016 around 11:57 p.m., officers from the Los Angeles Police Department were dispatched to A&D Liquor Mart located on Sherman Way and Bellaire in North Hollywood,

4

California to investigate a possible crime. They located a "demand note" on the ground at the entrance of the market which said "Real simple. Give us the fucking money from the register or we will fucking kill you." The store clerk, Mohammed Kalam, was found lying on the ground behind the counter. He was deceased with a single gunshot wound to his face.

The surveillance video from A&D Liquor Mart captured the incident from various angles. The video shows two women approach Kalam who is behind the counter. One of the women wore black clothing with a Chicago Bulls baseball cap. The other was in a striped hoodie. The one dressed in black handed Kalam a note which Kalam tossed back. This repeated several times. The one dressed in black then read the note to Kalam. The woman in the hoodie pulled out a handgun and pointed it at Kalam. As Kalam moved towards a cordless phone, the woman in the hoodie tracked him with her gun and pulled the trigger but the gun jammed. She tried to unjam the gun and pulled the trigger again, but the gun did not fire. After again attempting to unjam the gun, she raised the gun and pointed at Kalam's face. She pulled the trigger. This time, the gun fired dropping Kalam to the ground. The woman in black with the baseball cap reached over to the register but was unable to open it. Both women are captured running out of the store.

Homicide detectives from the Los Angeles Police Department obtained still photographs from the surveillance video. Barrientos's sister identified her as the person in the hoodie. Barrientos was further identified by Inzunza's mother, by Barrientos's brother's girlfriend, as well as by Aguirre.

The demand note was dusted for finger prints. Several latent prints were lifted. The latent prints were compared to prints belonging to both. The latent prints matched.

On September 24, 2016 around 5:35 p.m., Barrientos and Inzunza exchanged text messages about "us[ing] the strap." A "strap" is vernacular for a firearm.

### *Defense Evidence*

Neither Barrientos nor Inzunza testified or offered any witnesses or evidence on their behalf.

## DISCUSSION

## I.    Barrientos's Claim of Trial Counsel's Abandonment

Barrientos claims that her "[t]rial counsel's complete failure to subject the prosecution's case to meaningful adversarial testing affected every aspect of trial, resulting in the functional equivalent of the complete denial of [her] due process right to a fair trial and her Sixth Amendment right to effective assistance of counsel." Citing *Cronic, supra,* 466 U.S. 648, Barrientos contends prejudice is presumed and a reversal required. We disagree.

## A.    Legal Principles

"Under *Cronic*, if defense counsel 'entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable,' and the conviction must be reversed without further prejudice analysis. [Citation.] 'A complete denial of counsel at a critical stage of the proceedings' is sufficient to trigger the *Cronic* presumption of prejudice. [Citation.] 'But when the defendant is represented by counsel, the [*Cronic*] presumption of prejudice will only stand when counsel entirely failed to subject the prosecution's case to

6

meaningful adversarial testing. [Citations.]' [Citation.] Otherwise, 'specific errors and omissions' by trial counsel must generally be litigated as ineffective assistance of counsel claims under *Strickland* [*v. Washington* (1984) 466 U.S. 668 (*Strickland*)]. [Citation.]" (*People v. Banks* (2014) 59 Cal.4th 1113, 1169-1170, abrogated on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 391 & fn. 3.)

Where the *Cronic* presumption does not apply, the burden falls on the defendant challenging her counsel's performance to establish relief. (*Strickland, supra,* 466 U.S. at p. 687.) To obtain relief based on a claim of ineffective assistance of counsel, an appellant must establish (1) that her counsel's performance was so deficient that it amounted to a failure to function as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficiency prejudiced the outcome. (See *Strickland* at p. 687; and see, e.g., *People v. Pensinger* (1991) 52 Cal.3d 1210, 1252.) An attorney's performance is deficient under *Strickland* when his conduct falls below objective standards of reasonableness under prevailing professional norms. (*Strickland,* at p. 688.) Prejudice under *Strickland* is established where there is a reasonable probability that, absent counsel's alleged errors, the outcome of the proceeding would have been different. (*Id.* at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*)

B.    **Analysis**

Barrientos claims the *Cronic* presumption applies because "[c]ounsel did not file any pretrial motions and did not make any oral motions in limine prior to or during the course of the trial. Counsel initially reserved opening statement but later did not make an opening statement before resting. Counsel made no

7

effort to cross examine 13 of the 16 prosecution witnesses at trial." Barrientos further argues, "[c]ounsel rested without presenting any affirmative witnesses, evidence or defense. Counsel did not request any jury instructions beyond those proposed by the trial court and did not object to the admission of any of the prosecution exhibits. . . . Counsel's abandonment of [Barrientos] became complete once he waived closing argument, a critical stage of trial at which assistance of counsel is vital."

The Attorney General counters, "[t]his case does not present the type of situation addressed by *Cronic*, where 'the process loses its character as a confrontation between adversaries.' " (*Cronic, supra*, 466 U.S. at pp. 656-657.) In support of its position, the Attorney General points to counsel's adversarial actions taken during the trial including: (1) having a question removed from the juror questionnaire, (2) reading the completed questionnaires, thoroughly questioning prospective jurors, moving to dismiss two jurors for cause, and exercising peremptory challenges, (3) making evidentiary objections at trial, (4) strategically agreeing to stipulate to the victim's cause of death, (5) joining in a defense motion to deny the prosecution's request to have Aguirre declared as an unavailable witness, (6) cross-examining three witnesses, (7) discussing with Barrientos her right, and, decision whether to testify, and (8) pointing out errors in the verdict forms before they were given to the jury.

Our review of the record shows Barrientos and Inzunza faced what the prosecutor called "a mountain of evidence." The video evidence from A&D Liquor Mart, the demand note, the fingerprint match, the testimony of Aguirre placing Barrientos and Inzunza at A&D Liquor Mart when the incident occurred, and the identification of the still photographs by family members,

8

left no wiggle room whatsoever. Rather than give up as Barrientos claims, counsel for Barrientos fought to defend his client when circumstances adverse to his client came up during the trial.

For example, during the prosecutor's examination of Barrientos's mother, Luisa Ilina Camay who was hostile to the prosecutor's questions, the prosecutor attempted to have Camay identify Barrientos from a booking photograph. After the prosecutor marked the booking photo as an exhibit, counsel for Barrientos requested a side bar.

"[Counsel for Barrientos:] Judge, we need a sidebar.

"The Court: . . . We're outside the presence of the jury.

"[Counsel for Barrientos:] It's a booking photo. I don't think – – I think it should be sanitized.

"The Court: Yeah. I'm going to ask that you fold it so it's just showing the picture and for the jury just submit a photo."

When discussing jury instructions with the trial court, counsel for Barrientos sought changes to CALCRIM No. 540A[4] from the trial court's draft:

_____

[4]     CALCRIM No. 540A is an instruction on the first degree felony-murder rule for the actual killer. The instruction as given read as follows:

"The defendants are also charged in Count 1 with murder, under a theory of felony murder.

"To prove that the defendant is guilty of first degree murder under this theory, the People must prove that:

"1. The defendant committed or attempted to commit Robbery;

"2. The defendant intended to commit Robbery;

"AND

"3. While committing or attempting to commit Robbery, the defendant caused the death of another person.

9

"The Court: Okay. Now, as to 540A, [counsel for Barrientos], you had brought up an issue with the court as we were getting ready to go on the record and go over instructions. I know you were concerned with the way it's worded with the defendants' names being in it.

"[Counsel for Barrientos:] That's correct.

"The Court: Can you explain what you're – – you're concerned where it says, 'Defendant Barrientos,' and – – this is as to 540A. That is charges with murder under the felony rule and then 540 by defendant Maria Inzunza may also be guilty of murder. Your issue is with having their names, and the court almost implying that they're the ones who did certain acts?

"[Counsel for Barrientos:] Right. And I expressed that off the record."

The trial court and all counsel continued to discuss whether the names were to remain or come out from CALCRIM No. 540A. The prosecutor voiced concerns about using the word "defendants" in CALCRIM No. 540A as requiring him to prove the elements in that instruction as to both Barrientos and

---

"A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.

"To decide whether the defendant committed or attempted to commit Robbery, please refer to the separate instructions that I have given you on that crime. You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder.

"The defendant must have intended to commit the felony of Robbery before or at the time that she caused the death.

"It is not required that the person die immediately, as long as the act causing death occurred while the defendant was committing the felony."

10

Inzunza, even though only one of them committed the fatal act. The trial court continued:

"The Court: I'm not really happy about this. Your theory is that Rosa Barrientos is the shooter; is that correct?

"[The Prosecutor:] Yes.

"The Court: And that Maria Inzunza was --

"[The Prosecutor:] Did not commit a fatal act.

"The Court: Right.

"[The Prosecutor:] Correct.

"The Court: Over the defense objection I'm going to leave the names in. I'm changing too many things.

"[Counsel for Barrientos:] I'm sorry. I strongly object to this because what's going on – – what's going on is it can only be interpreted by this jury that a specific person did in fact specifically do X, Y, or Z, whatever it is. And that's not – – that's a bad thing because it does imply the court's taking a position. I don't care about [the prosecutor's] theories. I don't care about any of [it]. It's for the jury to decide who did what. And the rest of it falls in place.

"The Court: No. I understand that. And that's just – – hold on. Let me check the hard copy.

"[Counsel for Barrientos:] His theory is his theory. All I'm saying is the purpose of the instructions is to guide this jury, not to pick a theory or pick a party. That's for [the prosecutor] to explain."

The trial court decided to strike Barrientos's name from CALCRIM No. 540A.

"Meaningful advocacy" as discussed in *Cronic* must not be viewed in a vacuum. Appropriate defensive strategies often depend on the weakness of the prosecutor's case. When, as here,

11

the prosecutor's evidence is strong, defensive strategies narrow and become limited. In this difficult case, counsel for Barrientos's forceful advocacy to ensure that the trial court remained neutral in its wording on CALCRIM No. 540A shows, far from abandoning his client, he was strategically picking his battles. As the examples identified by the Attorney General show, counsel for Barrientos tactically chose when to fight. The totality of the record does not support Barrientos's position that she was abandoned. As such, the presumption of prejudice under *Cronic* does not apply. Instead, Barrientos must overcome *Strickland*'s burden on ineffective assistance of counsel.

Barrientos identifies various alleged failures by her counsel as bases of her claim of ineffective assistance of counsel. She must show both (1) deficient performance, and (2) prejudice. (*Strickland, supra,* 466 U.S. at p. 687.)

As noted earlier in this section of the opinion, Barrientos faults her counsel on various grounds including: (1) not filing any pretrial motions nor making any oral motions in limine prior to or during the course of the trial, (2) not making an opening statement before resting, (3) not cross-examining 13 of the 16 prosecution witnesses at trial, (4) resting without presenting any affirmative witnesses, evidence or defense, (5) not requesting any jury instructions beyond those proposed by the trial court and not objecting to the admission of any of the prosecution exhibits, and (6) waiving closing argument.

Other than faulting her counsel for not investigating a mental defense, Barrientos does not provide much analysis on other alternative actions that counsel should have taken. What pretrial motion or motion in limine should counsel have made? What jury instruction should counsel have requested? What

12

exhibit by the prosecutor should counsel have objected to? Barrientos does not answer any of these questions. The decisional law is clear that "[c]ounsel is not ineffective for failing to make frivolous or futile motions. [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) Additionally, a failure to make a futile objection is not ineffective assistance. (*People v. Diaz* (1992) 3 Cal.4th 495, 562.)

Concerning cross-examination, it is fair to say the most damaging pieces of evidence against Barrientos as well as Inzunza, were not live witnesses, but rather, physical evidence – the surveillance video from A&D Liquor Mart and the demand note including the lifted latent prints. Our review of the record reveals the actual presentation of the evidence took a mere two and a half days packed with 16 witnesses. Except for Aguirre who was with Barrientos and Inzunza at A&D Liquor Mart when the incident occurred, and Garcia who testified about Barrientos and Inzunza "hanging out" at his home prior to the incident, all of the other witnesses' testimony were very short in duration. Indeed, counsel for Inzunza also decided not to cross-examine eight of the 16 witnesses called by the prosecution, and, where he decided to cross-examine, it was also very short. "As to whether certain witnesses should have been more rigorously cross-examined, such matters are normally left to counsel's discretion and rarely implicate inadequacy of representation. [Citations.] Defendant identifies no exculpatory or impeachment evidence that counsel could have revealed by further questioning of prosecution witnesses and that would have produced a more favorable result at trial." (*People v. Cox* (1991) 53 Cal.3d 618, 662, fn. omitted, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22, and superseded by statute on

13

other grounds as stated in *Jones v. Superior Court* (1994) 26 Cal.App.4th 1202, 1210.)

*People v. Carter* (2005) 36 Cal.4th 1114 (*Carter*) is instructive. *Carter* was a capital homicide prosecution where the appellant claimed his trial counsel was ineffective by failing to make an opening statement, present any evidence on defendant's behalf, and make any substantive closing argument. (*Id.* at p. 1188.) The appellant in *Carter* had been accused of five total murders of which he faced trial on three committed in Los Angeles. The other two were from Alameda and San Diego counties and introduced as other crimes evidence under Evidence Code section 1101, subdivision (b) in the trial conducted in Los Angeles County. (*Carter,* at p. 1146.)

In finding no ineffective assistance, the *Carter* court noted, "[e]ach one of counsel's decisions—to forgo making an opening statement, present a defense, or offer more than a brief summation—was tactical. In view of the strong evidence directly linking defendant to the charged murders, as well as the looming prospect of other capital trials in Alameda and San Diego Counties arising out of the deaths of Tok Kim and Janette Cullins, reasonably competent counsel could have determined to hear the prosecution's case prior to deciding whether to present a defense, and further could have determined that counsel's summation ought to be limited to inviting the jury to consider whether the prosecution actually had met its burden of establishing guilt beyond a reasonable doubt. [Citation.]" (*Carter, supra,* 36 Cal.4th at p. 1189.)

While Barrientos did not face additional charges in other counties as in *Carter*, the prosecution's case against her was equally overwhelming. Counsel for Barrientos knew he had to

14

walk a fine line. If he pushed too hard, he could potentially turn the jurors against his client even more. What occurred during closing argument is illuminating. The prosecution relied on alternate theories of first-degree murder liability under willful, deliberate premeditation, and, the felony-murder rule. Added to this were instructions on principals, aiders and abettors, attempted robbery and the instructions on special circumstance.[5] Recognizing the layers of complexities involved in the jury instructions, the prosecutor in his closing argument noted, "And there are a lot of jury instructions. And the jury instructions, they have parts and subparts and then sub-subparts. And just when you think you're at the end of [one] there's yet another section. And it's a forest of different bullet points and numbers. And I know it's complicated." Added to this, the prosecutor argued that Barrientos and Inzunza were both principals and

---

[5] The trial court instructed the jury using CALCRIM. Among other instructions, the trial court gave Nos. 400 (Aiding and Abetting: General Principles), 401 (Aiding and Abetting: Intended Crimes), 500 (Homicide: General Principles), 520 (First or Second Degree Murder With Malice Aforethought), 521 (First Degree Murder), 540A (Felony Murder: First Degree – Defendant Allegedly Committed Fatal Act), 540B (Felony Murder: First Degree – Coparticipant Allegedly Committed Fatal Act), 548 (Murder: Alternative Theories), 640 (Deliberations and Completion of Verdict Forms: For Use When Defendant Is Charged With First Degree Murder and Jury is Given Not Guilty Forms for Each Level of Homicide), 700 (Special Circumstances: Introduction), 703 (Special Circumstances: Intent Requirement for Accomplice After June 5, 1990 – Felony Murder), 730 (Special Circumstances: Murder in Commission of Felony), and 1600 (Robbery).

aiders/abettors to each other in committing the attempted robbery. There existed a possibility for jury confusion.

At the end of the prosecutor's initial closing argument, the trial court asked:

"The Court: . . . The People have now finished their closing argument. I know that the [two] of you had been deciding whether or not you wanted to give a closing argument in this case. Have you decided that yet?

"[Counsel for Inzunza:] Yes.

"The Court: And what is that decision?

"[Counsel for Inzunza:] We're going to waive.

"The Court: Okay. And I just want to be clear. This is for strategic purposes as to both of you; is that correct?

"[Counsel for Barrientos:] That is correct.

"[Counsel for Inzunza:] Yes."

Given the multiplicity of instructions combined with the strength of the prosecution's evidence against Barrientos, a reasonably competent attorney could have determined a probability existed for jury confusion and that making a closing argument would only provide the prosecutor with an additional opportunity to clarify them. Not making a closing argument was tactical.

For the above reasons, Barrientos has failed to establish that her counsel's alleged failures were deficient under prevailing professional norms and that they resulted in prejudice to her case.

## II.    Inzunza's Eighth Amendment Claim

Inzunza contends her sentence to life without the possibility of parole violates the Eighth Amendment's proscription against cruel and unusual punishment because post-

16

SB 1437, proof of culpability as a non-killer aider and abettor for a felony murder based special circumstance under section 190.2, subdivision (a)(17) requires nothing more than proving first degree felony murder under section 189, subdivision (e)(3). Therefore, as applied, California's statutory scheme fails to provide a meaningful basis for distinguishing between those persons deserving special circumstance punishment from those who do not. As such, Inzunza asserts, she is entitled to have her sentence modified from life without the possibility of parole down to a term of 25 years to life. We disagree.

*Analysis*

Inzunza's contention centers on the passage of SB 1437 which amended section 189.[6] Under section 189, subdivision (e), SB 1437 narrowed the liability for first degree felony murder to: 1) the actual killer, 2) the aider and abettor who intended to kill, and 3) the aider and abettor who was a major participant and acted with reckless indifference to human life. (§ 189, subd. (e)(1)–(3).)

Inzunza contends, "California's felony-murder based special circumstance of attempted robbery is unconstitutionally applied when, as here, the state's theory for the predicate offense – first degree felony murder based on aiding and abetting principles – requires proof of elements identical to those necessary to establish that special circumstance pursuant to . . . section 190.2,

---

[6] SB 1437 also amended section 188, eliminating murder liability under the natural and probable consequences doctrine and added section 1170.95 creating a retroactive petition procedure. On the elimination of the natural and probable consequences doctrine, see *People v. Gentile* (2020) 10 Cal.5th 830, 839 (*Gentile*).

17

subdivisions (a)(17) and (d).  This statutory scheme provides no meaningful basis for distinguishing between first degree felony-murderers punishable by 25 years-to-life in prison from those who commit this special circumstance but who are punishable by either or [*sic*] life imprisonment without possibility of parole or death."[7]  Inzunza relies on *Lowenfield v. Phelps* (1988) 484 U.S. 231 and claims California's statutory scheme is distinguishable from those where the high court has permitted the use of the same facts to determine death eligibility and as a penalty factor for consideration in capital cases.

The Attorney General counters that Inzunza lacks standing to challenge the statutory scheme because she was not sentenced to death.  Additionally, the Attorney General argues that section 1170.95 is the exclusive remedy to seek relief based on the changes that SB 1437 made to the law of murder.

"[S]tanding in federal courts is limited by article III of the United States Constitution."  (*Reycraft v. Lee* (2009) 177 Cal.App.4th 1211, 1217.)  "In assessing standing, California courts are not bound by the 'case or controversy' requirement of article III of the United States Constitution . . . .  'California decisions . . .  generally require a plaintiff to have a personal

---

[7]     Punishment for first degree murder is prescribed under section 190, subdivision (a) which states, "Every person guilty of murder in the first degree shall be punished by death, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of 25 years to life.  The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5."  (§ 190, subd. (a).)

interest in the litigation's outcome.' [Citation.]" (*Bilafer v. Bilafer* (2008) 161 Cal.App.4th 363, 370.)

The federal cases cited by the Attorney General do not control the pathway to California's appellate courts.[8] In any event, we do not read Inzunza's contention as challenging California's capital punishment scheme generally. Instead, she uses the rubric of the capital punishment jurisprudence to argue under the current/relevant statutory laws on murder and special circumstances, as applied, the imposition of life without the possibility of parole is not properly narrowed from the category of individuals convicted of first degree felony murder as non-killer aiders and abettors. Standing does not preclude her from making this challenge.

In *Gentile, supra,* 10 Cal.5th 830, the California Supreme Court held that section 1170.95 is the exclusive remedy for retroactive relief on non-final convictions obtained before the law's effective date. (*Gentile,* at pp. 851-852.)

SB 1437 took effect on January 1, 2019.[9] Section 1170.95 established a retroactive procedure which allows those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining

---

[8] The Attorney General cites *Allen v. Wright* (1984) 468 U.S. 737 and *Houston v. Roe* (9th Cir. 1999) 177 F.3d 901.

[9] The California Legislature passed SB 1437 in 2018, and the bill was signed by the Governor on September 30, 2018. As a bill enacted at a regular session, the bill became effective on January 1, 2019. (See Cal. Const., art. IV, § 8, subd. (c)(1).)

19

counts . . . ." (§ 1170.95, subd. (a).) Individuals seeking relief must meet three conditions: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[,] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[, and] [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (*Id.*, subd. (a)(1)-(3).)

Inzunza is not seeking relief provided under section 1170.95: she is not asking to have her murder conviction vacated and to be sentenced on the remaining count. She is not claiming that her murder conviction is invalid based on the change to section 189 amended by SB 1437. Section 1170.95 is not a bar to raising this contention.

## A. The "Narrowing" Process in Capital Punishment Jurisprudence

The United States Supreme Court explained that, "[t]o avoid . . . constitutional flaw, [a state's law] must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." (*Zant v. Stephens* (1983) 462 U.S. 862, 877.)

"The United States Supreme Court's capital punishment jurisprudence rests on the principle that ' " 'the infliction of a sentence of death under legal systems that permit this unique penalty to be . . . wantonly and . . . freakishly imposed' " ' violates

20

the Eighth and Fourteenth Amendments to the federal Constitution.  [Citations.]  [¶]  The high court has drawn a distinction between two aspects of capital sentencing: 'narrowing' and 'selection.'  'Narrowing' pertains to a state's 'legislative definition' of the circumstances that place a defendant within the class of persons eligible for the death penalty.  [Citations.]  To comport with the requirements of the Eighth Amendment, the legislative definition of a state's capital punishment scheme that serves the requisite 'narrowing' function must 'circumscribe the class of persons eligible for the death penalty.'  [Citation.]" (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 465.)

Our research has not turned up any non-capital punishment cases – specifically, those involving life without the possibility of parole sentences – utilizing the rubric of the capital punishment jurisprudence to assess whether a sentence violates the Eighth Amendment's proscription against a cruel and unusual punishment.  For non-capital cases, the United States Supreme Court has set out a three-part test to determine "whether a sentence is so disproportionate that it violates the Eighth Amendment: '(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.' [Citation.]" (*Ewing v. California* (2003) 538 U.S. 11, 22 (*Ewing*).)

In California, when defendants challenge their non-capital sentence on the ground it violates the Eight Amendment, the three-part test described in *Ewing* is routinely used.  *People v. Johnson* (2010) 183 Cal.App.4th 253, is a fair example.  In *Johnson*, the non-killer aider and abettor was charged with attempted robbery, murder under a theory of felony murder, and

a section 190.2, subdivision (a)(17) special circumstance. The appellant claimed her life without the possibility of parole sentence was cruel and unusual under the Eighth Amendment based on her non-lethal conduct in the underlying felony. In analyzing the Eighth Amendment claim, the *Johnson* court noted, "[w]e, like the trial court when it determined the sentence and when it later refused to modify the sentence, use a three-pronged approach to determine whether a particular sentence is grossly disproportionate. First, we review 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' [Citation.] Second, we compare the challenged punishment with punishments prescribed for more serious crimes in our jurisdiction. [Citation.] Third, and finally, we compare the challenged punishment to punishments for the same offense in other jurisdictions. [Citation.] The importance of each of these prongs depends upon the facts of each specific case. [Citation.] Indeed, we may base our decision on the first prong alone. [Citation.]" (*Johnson,* at pp. 296-297.) The method of analysis Inzunza asks us to conduct is not how appellate courts analyze an Eighth Amendment claim of cruel and unusual punishment for non-capital judgments.

**B.    Capital Punishment Jurisprudence Does Not Apply to Inzunza's Claim**

Inzunza was sentenced to life without the possibility of parole.[10] Inzunza, however, asks us to conduct the high court's

---

[10]    On August 22, 2019, the trial court sentenced Inzunza to a term of life without the possibility of parole on count 1 for the murder, and a consecutive determinate term of three years on count 2 for the attempted robbery, to run consecutive pursuant to section 669.

22

"narrowing" analysis applicable in capital punishment appeals despite her non-capital judgment. She cites *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), *People v. Estrada* (1995) 11 Cal.4th 568 (*Estrada*), and *People v. Garcia* (1984) 36 Cal.3d 539 (*Garcia*), and argues even though she was not sentenced to death, "[t]he proper construction of these statutes in this non-capital case must be consistent with its construction in a capital case." As will be explained below, these cases do not support her position.

In *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), the high court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement."[11] (*Id.* at p. 158.) In response to *Tison*, when Proposition 115, called the "Crime Victims Justice Reform Act," was passed by the electorate in 1990, it added section 190.2, subdivision (d).[12] When the

---

[11] In *Enmund v. Florida* (1982) 458 U.S. 782, the high court held, "Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the [victims]. This was impermissible under the Eighth Amendment." (*Id.* at p. 798.)

[12] Section 190.2, subdivision (d) states, "Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special

prosecution files a section 190.2, subdivision (a)(17) special circumstance allegation against a non-killer aider and abettor under the felony-murder rule, they must prove that the accomplice was a major participant who acted with reckless indifference to human life beyond a reasonable doubt before capital punishment, or, life without the possibility of parole may be imposed. (§ 190.2, subd. (d).)

In *Banks, supra,* 61 Cal.4th 788, our Supreme Court provided criminal law practitioners and lower courts with specific guidance on the requirements of "major participation" and "reckless indifference to human life" for a non-killer aider and abettor when a felony murder special circumstance is alleged pursuant to section 190.2, subdivision (a)(17). The *Banks* court explained, "the standards we articulate, although developed in death penalty cases, apply equally to cases like this one involving statutory eligibility under section 190.2(d) for life imprisonment without parole." (*Banks,* at p. 804.) *Banks*, however, was not concerned with the "narrowing" process in capital punishment jurisprudence as in a death penalty appeal, but instead, on the constitutional requirements discussed in *Tison* – facts that support "major participation" and "reckless indifference to human life." (*Id.* at pp. 804-811.) The *Banks* court's reference to meeting constitutional standards relates to *Tison*'s analysis on these legal requirements for non-killer aiders and abettors when a felony murder special circumstance is alleged under section 190.2, subdivision (a)(17) applied under section 190.2, subdivision (d).

_____

circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

*Estrada* and *Garcia* are also equally unavailing. The main contention in *Estrada* centered on whether the trial court had a sua sponte duty to define "reckless indifference to human life." (*Estrada, supra*, 11 Cal.4th at pp. 574-575.) Discussing *Tison* as the source for the language used in section 190.2, subdivision (d), *Estrada* explained, "*Tison* was concerned with whether imposition of the *death penalty* on an accomplice to a felony murder who neither killed nor intended to kill the victim would violate the Eighth or Fourteenth Amendments. . . . *Tison* is the source of the language of section 190.2(d), and the constitutional standards set forth in that opinion are therefore applicable to *all* allegations of a felony-murder special circumstance, regardless of whether the People seek and exact the death penalty or a sentence of life without parole." (*Estrada*, at pp. 575-576.)[13] As in *Banks*, *Estrada* did not analyze the "narrowing" process within the high court's capital punishment jurisprudence.

*Garcia* is a 1984 case that predates our current law as well as *Tison* (published in 1987) on the requirements for non-killer aiders and abettors charged with a felony murder special circumstance under section 190.2, subdivision (a)(17). Until Proposition 115 changed the requirements to the *Tison* standard, prosecutors were required to prove that the non-killer aiders and abettors for felony murder special circumstance possessed the intent to kill. (See *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 145 ["We conclude that the history of the initiative, as well as its wording, supports a construction limiting the felony murder

---

[13]     *Estrada* ultimately held, trial courts did not have a sua sponte duty to define "reckless indifference to human life," because "[t]he phrase . . . does not have a technical meaning peculiar to the law . . . ." (*Estrada, supra,* 11 Cal.4th at p. 578.)

25

special circumstances to persons who intend to kill or aid in a killing."], superseded by statute recognized in *Banks, supra,* 61 Cal.4th at p. 798.)  In *Garcia*, the trial court had omitted to instruct the jury on intent to kill for the special circumstance allegation.  *Garcia* noted, "[t]he United States Supreme Court decisions make it clear that when intent is an element of a crime, an instruction directing the jury to find or conclusively presume intent denies due process, regardless of the weight of the evidence."  (*Garcia, supra,* 36 Cal.3d at p. 551.)  Again, as in *Banks* and *Estrada*, *Garcia* was not concerned with the "narrowing" process within the high court's capital punishment jurisprudence.

Inzunza is mistaken about the constitutional consistency discussed in *Banks* and *Estrada*.  The consistency discussed is not with the "narrowing" process within the high court's capital punishment jurisprudence.  Rather, the required consistency is on the *Tison* standards of "major participation" and "reckless indifference to human life."  This is so because section 190.2, subdivision (d) requires proof of "major participation" and "reckless indifference to human life" when a special circumstance is alleged pursuant to section 190.2, subdivision (a)(17) against a non-killer aider and abettor whether the prosecution seeks the punishment of death or life without the possibility of parole.  The same constitutional standards under *Tison* applies.  As such, we decline Inzunza's invitation to conduct the "narrowing" analysis under the capital punishment jurisprudence to resolve her contention.

Instead, we again look to *Banks* and *Estrada* for answers.  *Estrada* explained that "*Tison* was concerned with whether *imposition of the death penalty* on an accomplice to a felony

26

murder who neither killed nor intended to kill the victim would violate the Eighth or Fourteenth Amendments.  The decision itself does not stand for the proposition that imposition of a penalty less severe than death, such as life imprisonment without parole, would offend constitutional principles in the absence of proof of 'reckless indifference to human life.'  [Citation.]" (*Estrada, supra,* 11 Cal.4th at p. 575, italics added.)  In *Banks*, the California Supreme Court noted, "[a]s a purely constitutional matter, nothing would foreclose California from imposing life imprisonment without parole sentences on felony murderers with [Appellant's] degree of culpability.  [Citations.]" (*Banks, supra*, 61 Cal.4th at p. 804.)

Stated differently, for non-killer aiders and abettors under the felony-murder rule, California's statutory requirement under section 190.2, subdivision (d) to prove "major participant" and "reckless indifference to human life" when imposing the punishment of life without the possibility of parole is not constitutionally compelled under *Tison*.  Undoubtedly, SB 1437, by amending section 189, has raised the requirement for first degree felony murder on non-killer aiders and abettors to the *Tison* standard – a standard under which a state could potentially exact the punishment of death.  (See § 189, subd. (e)(3).)  Currently under California law, the standard of murder liability for non-killer aiders and abettors under the change made by SB 1437 to section 189, and, the special circumstance requirements of section 190.2, subdivision (d), both meet the *Tison* standard for imposing capital punishment.  While we express no views as to whether SB 1437 impacts the "narrowing" analysis under capital punishment jurisprudence if a defendant is sentenced to death, here, no such judgment applies.  Instead,

27

Inzunza was sentenced to life without the possibility of parole. If capital punishment could be exacted without offending the Eighth Amendment, a lesser sentence is certainly constitutional. Inzunza's sentence of life without the possibility of parole does not offend the Eighth Amendment.

## III. Section 654 Claim by Barrientos and Inzunza on Count 2

Barrientos and Inzunza contend the trial court's imposition of a consecutive term on the attempted robbery count (Count 2) in addition to the sentence imposed on the murder count (Count 1) violated section 654's proscription against multiple punishments. Barrientos further claims the sentence imposed on count 2 violated the Double Jeopardy Clause of the Fifth Amendment.

### A. Legal Principles

Section 654, subdivision (a) states, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

Whether a course of criminal conduct is a divisible transaction which could be punished under more than one statute within the meaning of section 654 depends on the intent and objective of the actor. (*People v. Beamon* (1973) 8 Cal.3d 625, 637.) "It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible. [Citations.] We have traditionally observed that if all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective,

defendant may be found to have harbored a single intent and therefore may be punished only once.  [Citation.]  [¶]  If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'  [Citation.]"  (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

"The defendant's intent and objective are factual questions for the trial court, and we will uphold its ruling on these matters if it is supported by substantial evidence.  [Citation.]"  (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525.)

"Where a defendant is prosecuted *solely* on a theory of first degree felony murder, section 654 precludes punishment for both murder and the underlying felony.  [Citation.]  However, if the prosecution presents alternative theories—such as premeditation and felony murder—and there is evidence supporting a finding that the murder was premeditated, then the trial court may properly impose a sentence for both the murder and the felony. [Citation.]"  (*People v. Carter* (2019) 34 Cal.App.5th 831, 841.)

**B.    Analysis**

We start by analyzing the prosecutor's theory of liability for the murder charge.  In closing argument, the prosecutor expressly relied on both the theory of premeditation and the felony-murder rule in asking the jury to convict both Barrientos and Inzunza.  The prosecutor specifically argued the existence of express malice and premeditation each time Barrientos pulled the trigger but the gun jammed until finally, she shot the victim in the face killing him.  The prosecutor also argued for express

29

malice and premeditation against Inzunza based on the demand note which stated, "Real simple.  Give us the fucking money from the register or we will fucking kill you."  This is a case where the felony-murder rule was not the prosecution's sole theory of liability.  On the contrary, based on whether substantial evidence supports the trial court's decision, this is a case noted in *People v. Carter*, *supra*, 34 Cal.App.5th 831, where imposition of sentence without staying it, may be appropriate.

We next assess whether the trial court's findings are supported by substantial evidence.  Both counsel for Barrientos and Inzunza asked the trial court to run the sentence on Count 2 (attempted robbery) concurrent with Count 1 (first degree murder with a special circumstance).  The trial court stated:

"Okay.  Okay. As to – – I have given a lot of thought as to the sentence and running Count 2 concurrent to Count 1.  I'm not sure if I even can, but if I could I'm going to choose not to run it concurrent.  And I am going to run it consecutive, especially as to Ms. Barrientos.  What really struck me in this case was watching the video and the fact that that gun didn't fire multiple times.  There were so many opportunities for either [one] of them at that point to stop and to deflect and to say, no.  We need to just leave.  And Ms. Barrientos kept trying.  Nothing was going to stop her from shooting that gun.  [¶]  To me it almost seemed like it was separate from the even act of the robbery.  I've never seen a gun – – I don't think it jammed as much as she just couldn't get it to fire and to keep going on and on.  It just surprised me how easily this could have stopped at that moment.  [¶]  I know rash decisions happen and people make decisions that they regret for the rest of their lives.  And sometimes they get a chance to say, if I could have done it differently.  And she had that chance.  For

whatever reason she had that chance to stop at that moment, and she chose to go on. [¶] And Ms. Inzunza was right there and could have at any moment stopped her when she saw what was going on, when that gun wouldn't fire."

In exercising its discretion to impose a consecutive sentence for the attempted robbery charge, the trial court's primary attention was on Barrientos. While Barrientos contends the incident was an indivisible course of conduct that took a mere 30 seconds from start to finish and that the only apparent objective was to take money from the victim, the trial court's comments belie her position. By her actions depicted in the video, the trial court implicitly found that Barrientos exhibited a pre-determined intent to kill Kalam which was separate from the robbery. In support of its view, the trial court explained that each time the gun jammed, Barrientos had an opportunity to reflect and stop from further violence but instead chose to continue and ultimately shot Kalam to death. The record shows Barrientos shot Kalam in the face. The trial court's implicit finding that Barrientos entertained a separate objective and intent – to kill Kalam – is supported by substantial evidence.

Citing *People v. Wader* (1993) 5 Cal.4th 610 (*Wader*), Barrientos also contends the sentence on count 2 violates the Double Jeopardy Clause of the Fifth Amendment of the federal Constitution. The United States Supreme Court explained that the Double Jeopardy Clause of the Fifth Amendment "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." (*North Carolina v. Pearce* (1969) 395 U.S. 711, 717, fns. omitted.)

31

Sentencing on count 2 for the attempted robbery falls under the category of protection against multiple punishments for the same offense.  *Wader* cited *Jones v. Thomas* (1989) 491 U.S. 376 (*Jones*), which dealt with a felony murder conviction where the trial court also imposed a consecutive term for the underlying felony.  (*Id.* at p. 381.)  On this, the high court explained, "[t]he answer turns on the interest that the Double Jeopardy Clause seeks to protect.  Our cases establish that in the multiple punishments context, that interest is 'limited to ensuring that the total punishment did not exceed that authorized by the legislature.'  [Citations.]  The purpose is to ensure that sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments.  [Citation.]"  (*Ibid.*)

Our Supreme Court resolved this question in *People v. Holt* (1997) 15 Cal.4th 619 (*Holt*).  *Holt* first noted that the double jeopardy issue came up in *Jones* because the "Missouri Legislature did not intend to allow conviction and punishment for *both* felony murder and the underlying felony.  [Citations.]" (*Jones, supra,* 491 U.S. at p. 381.)  In contrast, California's "1978 death penalty law expressly provides that a felony underlying a felony-murder special circumstance 'be charged and proved pursuant to the general law applying to the trial *and conviction* of the crime.'  [Citation.]  Since section 190.3 expressly permits the sentencer to consider both the circumstances of the crime and a special circumstance based on conviction of a felony which underlies the first degree felony-murder conviction, there is no federal double jeopardy violation.  [Citations.]" (*Holt, supra,* at

32

pp. 692-693.)[14]  Since California's Legislature does not forbid sentencing in this context, the Double Jeopardy Clause of the Fifth Amendment is not a bar to sentencing on the attempted robbery conviction.

For Inzunza, the trial court's decision to impose a consecutive sentence rested on its view that she could have stopped Barrientos from shooting Kalam but did not do so.  This finding by the trial court does not resonate with clarity.  Failure to act is susceptible to various reasons such as fear, lack of care, inattention, as well as, perhaps, a desire to see the thing done by the other actor, here Barrientos.

" 'Substantial evidence' means that evidence which, when viewed in light of the entire record, is of solid probative value, maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined." (*People v. Conner* (1983) 34 Cal.3d 141, 149.)  Inzunza's failure to stop Barrientos from shooting Kalam does not meet this definition.  Her inaction is not substantial evidence that she entertained a separate objective from the robbery – an intent to kill.

## IV.    Apprendi Challenge to the Consecutive Term on Count 2

Barrientos and Inzunza contend that the factual findings made by the trial court to impose consecutive terms violated their Sixth Amendment right to a jury trial as well as their Fourteenth Amendment right to due process.  We disagree.

---

[14]     *Holt* cited section 190.4, subdivision (a) which states in relevant part, "Whenever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime."  (§ 190.4, subd. (a).)

*Analysis*

In *Apprendi*, the United State Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi, supra*, 530 U.S. at p. 490.) Four years later, in *Blakely v. Washington* (2004) 542 U.S. 296, the high court explained that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." (*Id.* at pp. 303-304.) Under *Cunningham v. California* (2007) 549 U.S. 270, the high court held California's determinate sentencing scheme (section 1170 et seq.) which at the time utilized a "presumptive" middle term, violated *Apprendi* and its progeny when a trial court made factual findings of aggravating circumstances – other than a fact of a prior conviction – to impose the upper term. (*Cunningham*, at p. 293.)

These cases, however, did not address whether the imposition of consecutive sentences on counts found by the jury or admitted by the defendant violated the Sixth Amendment right to a jury trial. This question was answered in *Oregon v. Ice* (2009) 555 U.S. 160 which explained, "[t]he historical record demonstrates that the jury played no role in the decision to impose sentences consecutively or concurrently. Rather, the choice rested exclusively with the judge." (*Id.* at p. 168.) The high court further explained that "[i]n light of this history, legislative reforms regarding the imposition of multiple sentences do not implicate the core concerns that prompted our decision in *Apprendi*. There is no encroachment here by the judge upon facts historically found by the jury, nor any threat to the jury's domain

as a bulwark at trial between the State and the accused.  Instead, the defendant—who historically may have faced consecutive sentences by default—has been granted by some modern legislatures statutory protections meant to temper the harshness of the historical practice." (*Id.* at p. 169.)  Additionally, the "[s]tates' interest in the development of their penal systems, and their historic dominion in this area, also counsel against the extension of *Apprendi* that Ice requests.  Beyond question, the authority of States over the administration of their criminal justice systems lies at the core of their sovereign status." (*Id.* at p. 170.)  As such, the high court held that judicial fact finding to impose consecutive sentences, as under the Oregon statute, does not violate *Apprendi*.  (*Id.* at p. 172.)  In California, the rule under *Oregon v. Ice* was recognized in *People v. Scott, supra,* 61 Cal.4th at p. 405 (["the high court has held that 'the Sixth Amendment's restriction on judge-found facts' is 'inapplicable' when a trial judge makes factual findings necessary to the imposition of consecutive terms."].)

On this issue, Inzunza's claim has been rendered moot since we found merit in her section 654 contention that no substantial evidence supported the trial court's decision to impose consecutive terms.  As for Barrientos, we are bound by *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450 to follow the decisions of courts exercising superior jurisdiction, here the California Supreme Court as well as the United States Supreme Court.  (*Id.* at p. 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction.  It is not their function to attempt to overrule decisions of a higher court."].)

## V.    Second Strike Sentence for Barrientos

Barrientos contends, while the prosecution filed a prior conviction allegation pursuant to the California's Three Strikes law and alleged the same conviction as a five-year prior under section 667, subdivision (a), no jury or a court trial was conducted to determine its truth.[15]  The Attorney General concedes.  As well, our review of the record does not show the prior conviction alleged as a strike prior as well as a five-year prior was ever found true.  As such, the second-strike sentence and the imposition of the five-year prior on count 2 must be vacated and remanded for trial and resentencing.[16]

---

[15]    The Information alleged Barrientos had suffered a prior conviction that constituted a "strike prior" under section 667, subdivision (d) and section 1170.12, subdivision (b) for a robbery, in violation of section 211 in case No. BA428427, suffered on April 8, 2015 in Los Angeles County Superior Court.  The same prior conviction was also alleged as a five-year prior under section 667, subdivision (a).

[16]    The trial court used the strike prior only on count 2 for the attempted robbery when it doubled the middle term.  The trial court also only imposed the five-year prior on count 2.

## DISPOSITION

Sentence on count 2 for Barrientos is vacated. The matter is remanded for a trial on the prior conviction allegations and resentencing. Sentence on count 2 for Inzunza is remanded to vacate the imposition of a consecutive term and to stay the sentence pursuant to section 654.  In all other respects, the judgment for Barrientos and Inzunza are affirmed.


OHTA, J.*


We concur:



STRATTON, Acting P. J.



WILEY, J.

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.